### DISTRICT OF COLUMBIA FIRE AND MEDICAL SERVICES DEPARTMENT, Appellant,

#### v.

### DISTRICT OF COLUMBIA OFFICE OF EMPLOYEE APPEALS, Appellee.

**Selena Walker, Intervenor.**

**No. 08–CV–1557.**

District of Columbia Court of Appeals.

Argued Oct. 28, 2009.
Decided Jan. 7, 2010.

---

Carl J. Schifferle, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Mary T. Connelly, Assistant Attorney General, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellant.

No brief was filed on behalf of appellee.

Frederic W. Schwartz, Jr., for intervenor.

Before WASHINGTON, Chief Judge, REID, Associate Judge, and PRYOR, Senior Judge.

PRYOR, Senior Judge:

Appellant, District of Columbia Fire and Emergency Medical Services Department (FEMS), appeals the Superior Court order upholding the administrative decision of appellee, District of Columbia Office of Employee Appeals (OEA), which reversed the termination of the employment of Selena Walker, an employee of FEMS, on the basis of the timeliness of the removal action, as prescribed by D.C.Code § 5–1031(a) (2001). Appellant contends the final administrative decision rendered by OEA misconstrued the statute, which governs disciplinary action taken against police, firefighters, and emergency medical service personnel; it also contends that the underlying findings and conclusions are unsupported by substantial evidence. Being unpersuaded by these challenges, we affirm.

### Background

At about 9:20 p.m. on January 6, 2006, a resident of the 3800 block of Gramercy Street, Northwest called 911 to report an unknown man in distress, lying on the sidewalk. Fire Department engine 20 (E–20) and a Metropolitan Police Department (MPD) unit responded during the ensuing half-hour, examining and treating the man, David Rosenbaum. Rosenbaum was incoherent and had been vomiting. Within minutes, a Fire and Emergency Medical Services (FEMS) ambulance (A–18) arrived on the scene. FEMS A–18's crew consisted of emergency medical technician and crew leader Selena Walker, who drove, and firefighter and crewmember Michael Deems. When Walker and Deems arrived at Gramercy Street, firefighters told them that their diagnosis was "ETOH," alcohol intoxication. Rosenbaum

was put on a stretcher and placed in the ambulance. Walker returned to the driver's seat and did not examine Rosenbaum. Deems examined him and classified him as transport priority 3, "stable." With Walker driving and upon Walker's decision, Rosenbaum was transported to Howard University Hospital, even though Sibley Hospital was closer to the scene. The ambulance arrived at Howard at 10:18 p.m. Howard medical personnel discovered that Rosenbaum had a critical head injury. Rosenbaum died two days later. An autopsy determined the manner of death to be homicide and the cause to be blunt-impact trauma.

Within hours of Rosenbaum's arrival at Howard, in the early hours of January 7, 2006, supervisors directed Walker home on "administrative leave" and reassigned Deems to a fire engine. Both were instructed to submit written statements on the Rosenbaum call. In her January 7 statement, Walker wrote, "The report from E–20 was ETOH no other information was obtained from E–20. . . . I . . . transported the patient as a priority 3 to Howard University Hospital based on my partners findings." Later that morning, she was told that the patient should have been classified priority 1, "unstable," because of a hematoma and dilated, nonreactive pupils. On January 10, 2006, Walker was required to submit a second written statement. She wrote that she and Deems were "both basic EMTs with the same level of training" and that "[t]here was no particular reason for transporting to Howard rather than Sibley." On January 11, 2006, she submitted a third statement. "Based on the reports given by both E–20 and their F/F–EMT and my partner F/F–EMT Deems following their assessments," she wrote, "the patient was deemed a low priority and by protocol the patient was

transported to Howard University Hospital."

Fire chief Adrian Thompson issued a public statement January 11, 2006, to announce that a "review of the incidents and circumstances" of FEMS' response to the Rosenbaum call was "complete." He stated: "Our operational review indicates that appropriate measures were taken and EMS providers met all standards of care as outlined in our protocols."

On January 18, 2006, a specially convened FEMS panel of leaders interviewed Walker, Deems, and four firefighters who had been at the scene. Walker was accompanied by a union representative. A memorandum labeled "Confidential Prepared in Anticipation of Litigation" reports the substance of these interviews. The panel interviewed Walker once, then Deems, then Walker a second time. The memorandum reveals that in her first interview, Walker said that on reaching Gramercy Street, "I asked myself: they sent us all the way over here for ETOH?" She denied any involvement in assessing or caring for Rosenbaum at any time. She said that Deems, of whose EMT certification level she was "not sure," had assessed Rosenbaum as priority 3. "When asked why she chose" Howard, "EMT–A Walker stated variously 'I don't know,' and 'I don't remember.' " deems gave a different version of events:

> FF/EMT–B Deems states that [while at the scene,] he told [an] MPD Officer that they were going to Sibley Hospital, as it was closest. He states that EMT–A Walker then said: "No, we are going to Howard."

> When questioned further by the interviewers … FF/EMT–B Deems states: "Look you want to know the truth? She [EMT–A Walker] told me before we reached the scene that 'We're going to transport this patient to Howard,' be-

cause she needed to run her errands in that neighborhood, including going to the ATM and going by her house." He states that he ultimately deferred to EMT–A Walker on this issue because: "She was the ACIC [Ambulance Crewperson in Charge] and she has higher medical certification than me." … Asked if he believed at the time that patient care would be compromised by transporting the patient to Howard rather than Sibley or some other closer facility, he stated: "No."

Deems added that it was Walker who "assigned" the "final transport code" of priority 3 to Rosenbaum and that after leaving Howard, Walker drove A–18 to her home, "where her child 'came down and gave her some medicine while we waited outside.' " In her follow-up interview, Walker stated that she "probably" went to an ATM after Howard and "d[id]n't recall" going to any other destination.

On January 18, 2006, Mayor Anthony Williams announced the initiation of a "top to bottom review of this incident," supervised by the city administrator. The administrator asked the District of Columbia Office of the Inspector General (OIG) to determine, *inter alia*, whether FEMS employees followed rules, policies, protocols, and procedures, and whether Walker and Deems chose an appropriate hospital. Over the next five months, an OIG-appointed investigative team reviewed policies, rules, records, and reports and interviewed personnel who had participated in Rosenbaum's evaluation, care, and autopsy. On June 15, 2006, the OIG released its report. It found, *inter alia*, that the "highest-trained EMT" was "not in charge of [the] patient," that an "[i]ncorrect clinical priority" was assigned, that a "thorough patient assessment was not conduct-

ed," and that the decision to go to Howard "was not based on FEMS protocol." [1]

The review determined that Walker chose Howard for "personal reasons." Moreover, the team found that Walker's decision "delayed the emergency hospital care that would have been available minutes earlier." Walker told OIG investigators that EMTs "can go where [they] want to go" with patients. "When asked if she wanted to go to Howard," she "initially said 'No,' then changed her answer to 'Yes' and said she knew the way to Howard from Gramercy Street." Walker also acknowledged "that she thought that" after leaving Howard, "she drove the ambulance to her house to get money for dinner." [2]

On June 16, 2006, the day after the OIG report's release, Walker was sent a Proposed Removal Notice. Walker was advised that her actions on January 6, 2006, were "in violation of the emergency medical protocols which require that patients be transported to the nearest appropriate hospital."

## Administrative and Judicial Proceedings

On July 6, 2006, a hearing officer assigned to the case recommended that the proposal to remove Walker be sustained. The hearing officer repeated the findings and allegations of the OIG report and the Proposed Removal Notice. She concluded, "FEMS is well within their time limit to initiate disciplinary action." FEMS sent Walker a Notice of Final Decision on July 10, 2006, notifying her that she was being removed, effective July 14, for the reasons detailed in the Proposed Removal Notice. On August 10, 2006, Walker filed a Petition for Appeal with OEA challenging the timeliness [3] of her removal. On June 26, 2007, an administrative judge issued OEA's Initial Decision reversing FEMS' removal of Walker. The administrative judge noted that FEMS initiated its removal action "[a]s a result of the OIG report." He found, however, that FEMS *should have known* of the act or occurrence that supported its adverse action against the Employee on January 18, 2006, when the Interview Panel concluded its interview[s]" and should therefore have commenced any adverse action by May 26, 2006. (Emphasis in original.) He therefore reversed the initial ruling on the ground that the timing of the employee's discharge violated the statute.

FEMS petitioned for review of the Initial Decision. On October 5, 2007, OEA's governing board upheld the administrative judge's ruling. The board, essentially following the same rationale as the administrative judge, concluded that the adverse action was in violation of the pertinent statute and approved the decision of the administrative judge. FEMS next petitioned Superior Court for further review. The court found "no evidence of conflict

---

1. "The FEMS protocol for 'Adult Medical Emergencies: Altered Mental Status [Non–Traumatic]' requires that EMTs '[t]ransport patient to the closest appropriate open facility.' Sibley Hospital was the closest appropriate open hospital from Gramercy Street."

2. Deems repeated to the OIG team his assertions that Walker told him while en route to Gramercy Street that she wanted to go to Howard in order to run errands nearby, and that she drove the ambulance to her home after leaving Howard.

3. "[N]o corrective or adverse action against any sworn member or civilian employee of the Fire and Emergency Medical Services Department or the Metropolitan Police Department shall be commenced more than 90 days, not including Saturdays, Sundays, or legal holidays, after the date that the Fire and Emergency Medical Services Department or the Metropolitan Police Department knew or should have known of the act or occurrence allegedly constituting cause." D.C.Code § 5–1031(a) (2001).

424

between Walker's and Deems' statements regarding Walker's actions and" held that OEA properly applied § 5–1031(a) to its finding that FEMS should have known of its cause for removing Walker by January 18, 2006. The OIG investigation, it added, "did not act to toll the running of the 90–day statutory period." Accordingly, on November 4, 2008, Superior Court affirmed OEA's decision, which it concluded was supported by substantial evidence and not clearly erroneous as a matter of law. FEMS appeals to this court.

**Discussion**

For the sake of clarity, we set forth the pertinent section of the statute, D.C.Code § 5–1031(a):

> [N]o corrective or adverse action against any sworn member or civilian employee of the Fire and Emergency Medical Services Department or the Metropolitan Police Department shall be commenced more than 90 days, not including Saturdays, Sundays, or legal holidays, after the date that the Fire and Emergency Medical Services Department or the Metropolitan Police Department knew or should have known of the act or occurrence allegedly constituting cause.

Appellant contends that appellee erred, as a matter of law, because its construction of the provisions of the statute, when applied to the circumstances here, is unreasonable and therefore arbitrary. On an evidentiary level, appellant argues that the respective statements of the two FEMS crew members involved here were conflicting, thus rendering the FEMS leadership unable to reach a legitimate decision regarding termination of employment. In addition, appellant belatedly suggests that members of the FEMS ambulance service, in responding to emergency calls, often confront an uncertainty or "grey area" that exists between daily practice and written protocols (this latter assertion was barely addressed in appellant's briefs). On these latter grounds, appellant urges there is a lack of substantial evidence to support the administrative findings and conclusions.

Because we are reviewing an administrative decision, we apply a familiar scope of review. In appeals of OEA decisions on which the Superior Court has already ruled, our "scope of review is 'precisely the same' as in administrative appeals that come to us directly." *Johnson v. District of Columbia Office of Employee Appeals,* 912 A.2d 1181, 1183 (D.C.2006) (internal citations omitted). As such, OEA's "decision must state findings of fact on each material contested factual issue; those findings must be supported by substantial evidence in the agency record; and the agency's conclusions of law must follow rationally from its findings." *Id.* (internal citations omitted). We "examine the agency record to determine whether there [was] substantial evidence to support OEA's findings of fact, or whether OEA's action was arbitrary, capricious, or an abuse of discretion." *Bagenstose v. District of Columbia Office of Employee Appeals,* 888 A.2d 1155, 1157 (D.C.2005) (internal citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hutchinson v. District of Columbia Office of Employee Appeals,* 710 A.2d 227, 230–31 (D.C.1998) (internal citations omitted). Furthermore, "[a]s a general rule, this court owes deference to an agency's interpretation of the statute under which it acts" unless "inconsistent with the plain language of the statute itself." *District of Columbia Metro. Police Dep't v. Pinkard,* 801 A.2d 86, 90 (D.C.2002) (internal citations omitted) (reversing Superior Court's affirmance of OEA decision that firing was without cause); *see also Brownlee v. District of*

*Columbia Dep't of Health*, 978 A.2d 1244, 1247–48 (D.C.2009)

The history of the ninety-day rule counsels against FEMS' view that only knowledge with a high degree of certainty starts the statute's clock. The statute closely tracks the language of a prior statute that before its repeal in 1998 had barred any District of Columbia agency from initiating adverse action against an employee more than forty-five days after the agency knew or should have known of the action's cause. *Compare* § 5–1031(a) *with* § 1–617.1 (1979) (repealed 1998). The Committee on Government Operations wrote at the time of repeal that the forty-five-day duration was "unduly restrictive" but would "remain the goal," to be honored "in all but the most unusual circumstances." D.C. COUNCIL, REPORT ON BILL 15–194 at 14 (Dec. 9, 2003). In 2004, the Council imposed on FEMS and MPD the specific ninety-day deadline at issue here, expressly rejecting a forty-five-day option. *See* § 5–1031; Report on Bill 15–194 at 15. The change was motivated by the "exorbitant amount of time that the [adverse-action] process" was then taking, such that FEMS and MPD employees had to wait "months or even years to see the conclusion of an investigation against them." Report on Bill 15–194 at 13, 14. The deadline was intended to bring "certainty" to employees over whose heads a potential adverse action might otherwise linger indefinitely. *See id.* at 14–15. In sum, with respect both to the former and the current adverse-action deadline, the Council has consistently articulated a policy of expeditious handling of adverse actions. The comparatively forgiving FEMS and MPD deadline grants those agencies twice as much time to act as under the repealed provision, thus lessening the burden cited at the repeal of the forty-five-day rule and substantially diminishing any justification for untimely adverse actions.

Between the Rosenbaum incident and FEMS' initiation of adverse action against Walker, more than half a year passed. In the twelve days after the incident, Walker and Deems submitted various written statements and were interviewed at length by a special panel of high-ranking officials. During this multifaceted investigation, Walker said that there had been no reason for choosing Howard and, later, that she could not remember the reason; Walker acknowledged that she "probably" ran errands nearby after leaving Howard; and Deems stated that Walker chose Howard for her personal convenience. FEMS then waited five months before proposing to remove Walker for her "act or omission that interfere[d] with the efficiency or integrity of government operations," namely, acting on the basis of "personal reasons" rather than "the emergency medical protocols which require that patients be transported to the nearest appropriate hospital."

In these circumstances appellant argues that there was a conflict between the respective statements of Walker and Deems and as a result, FEMS asserts, it was unable to determine what action to take. This argument fails on at least two levels. Initially, as the Superior Court judge noted, there is no substantial conflict between the respective statements. Walker's statements concerning her behavior were evasive and sometimes inconsistent. Deems was simply more forthcoming. Their different versions did not conflict. More importantly, this approach to the assessment of the situation woefully understates the nature of an investigation. Generally an investigation is a comprehensive effort to clarify or better understand circumstances surrounding an incident or series of incidents. Of course, in some instances not every concern is resolved in the course of an investigation, nor is every person coop-

erative. Thus appellant's argument that Walker's evasiveness deterred their ability to act is unavailing. Manifestly, the Council did not intend that an agency should embark, free of any deadline, on an investigative period upon which FEMS here suggests there be no temporal limit. As the legislative history reviewed makes clear, the Council sought to expedite the process and provide certainty with some degree of balance and flexibility.[4] Indeed, in this case FEMS knew much the same information as the OIG reported months later.

We conclude that the administrative decisions interpret the statute consistent with the legislative intent, and that there is no error of law as the statute was applied here. There is also ample evidence in this case to meet the requirement of substantial evidence to support the administrative findings. We can readily defer to the findings of fact which have been made.

For the foregoing reasons, the decision of the Superior Court is affirmed.

*So ordered.*

---

4. Given our view of the case, we reject appellant's argument that the OEA's decision should be vacated because FEMS crew members might have perceived a "grey" area with respect to the effect of the protocols.